JOHN DONOHUE, PLAINTIFF AND PLAINTIFF IN ERROR, v. PUBLIC SERVICE RAILWAY COMPANY, DEFENDANT AND DEFENDANT IN ERROR.

Submitted March 17, 1910—Decided November 21, 1910.

Plaintiff sustained personal injuries while a passenger on an open trolley car operated by defendant. Upon the evidence submitted, the jury might have found that he was standing inside the car, leaning against the guard rail, and that while the car was running at very high speed the trolley left the overhead wire, and the pole striking one or more cross wires bounced backward and downward and was bent thereby sufficiently to strike, and did strike, plaintiff, inflicting the injury complained of. *Held*, a question for the jury whether the defendant should not, in the exercise of proper care, have anticipated some such accident as the result of the combination of high speed and a displaced trolley, and have taken measures to prevent it.

---

On error to the Supreme Court.

For the plaintiff in error, *Weller & Lichtenstein.*

For the defendant in error, *Edwards & Smith.*

The opinion of the court was delivered by

PARKER, J.  This was a suit for personal injuries sustained by plaintiff while a passenger on a trolley car operated by defendant.  At the close of plaintiff's testimony there was a motion to nonsuit, which was denied, and at the close of all the evidence defendant's counsel moved for direction of a verdict on the ground that no negligence of defendant had been shown.  The court announced its readiness to direct a verdict, but gave plaintiff the option of an involuntary nonsuit and exception thereto, which option was accepted, and nonsuit entered and exception sealed accordingly.  The sole question before us on this writ of error is whether the nonsuit was properly entered.

The negligence charged was substantially that the car was operated at such a high and dangerous rate of speed that the trolley pole left the wire, and striking and rebounding from some obstruction was bent in such a manner that it struck plaintiff on the head, causing a fracture of the skull and loss of brain substance resulting in partial paralysis.  That the pole left the wire was conceded or amply proved; that it struck plaintiff at all, or that it left the wire, or the accident occurred on account of negligent operation, was denied.  There was another allegation that the accident occurred by reason of defective equipment, but on this point the proof failed. The questions remain whether the pole actually struck plaintiff and if so, whether this accident could fairly have been found by the jury to have resulted from negligent operation.

Our examination of the evidence in the case satisfies us that the jury might have found the following as facts: That the car was one of four special cars carrying an excursion party or "trolley ride" to a local resort, and was on its return trip after midnight; that it was an open car, and was crowded, the back platform being full and the space between the seats, which were transverse, partly occupied by standing passengers; that plaintiff was standing in one of these spaces leaning against the guard rail: that the car was running on the company's own right of way, and running very fast, in the language of one witness (a motorman) "on the loop," in that of

another, at "train speed," a speed specifically stated by more than one witness as thirty-five to forty miles an hour; that it was swaying from side to side; that the trolley pole came off the wire under these conditions, and being elevated by its heavy spring struck one or more cross wires and bounded back, pounding or "crashing" on the roof three or four times; that a "dark object" was seen to fly down alongside the car once or twice; so that one witness seeing this, called to a friend to duck; that the dark object struck plaintiff on the head and he was seen to sink down in his place, and his skull subsequently was found fractured; the car being stopped after running about one hundred and fifty feet further, it was found that the pole had been bent so that it could not be replaced on the wire; it was bent in the form of an L or an "elbow;" according to plaintiff's principal witness it was bent down and hung over the side of the car, so that it would not reach the wire when raised.

Defendant strenuously claimed that the pole was bent up, not down, that it could not be drawn down sufficiently afterwards to be put on the wire, and that naturally it must have been bent up or forward on account of running into the cross wire, and if so bent it could not have been reflected back sufficiently to strike plaintiff. Conceding this last proposition for the sake of argument, there was positive evidence that the pole was bent down, as to which the evidence that it was in fact bent up presented a mere contradiction of testimony to be settled by a jury; and with respect to the claim that it must naturally have been bent up or forward because of striking the cross wires, it may be said that whether or not the pole would be bent forward would seem to depend in large measure upon the height of the cross wire above the car. If it were close to the car, the length of pole above it would tend to bend it forward; but if the cross wire was so high above the car that the point of contact was near the end of the pole when erect, there would probably be no perceptible bending of the pole on this account, but it might rebound back against the roof of the car, as the testimony for plaintiff indicates that it did; and if thrown to one side and rebounding

with sufficient force might well strike the roof backward with the end of the pole projecting over the side of the car in such a manner as to bend or spring the end with a heavy trolley wheel on it, backward and downward over the side so as to strike on the head a man leaning against the guard rail, near the rear of the car, as plaintiff was, especially if looking out. In the absence of any specific evidence as to the height of the cross wire, one theory is apparently as plausible as the other, and the conflict of testimony remains. It was consequently quite open to the jury to find that the pole did bend backward, not forward, and that its end came down at the side of the car and struck plaintiff on the head. It is claimed that witnesses who say they saw this "dark object" cannot be believed, and that in any event their statement that the "dark object" was the pole is a mere inference, on account of the total darkness that they say existed at the time, the pole being off the wire and the lights thereby extinguished; but it was for the jury to say whether the darkness must have prevented their seeing what they swore that they saw, and in view of the other circumstances testified to, and the absence of anything else that could reasonably have caused the accident, the right of a jury to say that it was the pole that struck plaintiff seems quite plain.

If there was evidence to support such a finding then it remains to inquire whether the evidence would support a further finding that such accident was due to defendant's negligence. We think that it would. It is true that on the evidence as presented in this case, the high speed of the car could not well be held accountable for the trolley leaving the wire on which it ran; but it could well be held accountable for what occurred immediately afterwards, viz., the violence with which the pole struck the cross wire and the corresponding violence with which (if the jury might so find) it was reflected back to the roof of the car, not once, but twice or thrice, insomuch that it was driven downward with sufficient force to strike plaintiff on the head. Whether defendant ought to have anticipated this precise form of accident as a result of the combination of high speed and a displaced trolley is not the point. That it

ought to anticipate a displacement of the trolley is shown by the testimony of its own witnesses that trolleys often come off without any apparent reason and irrespective of speed. We think, also, that it was open to the jury to say that the defendant ought reasonably to have anticipated that if the trolley should come off when the car was at high speed, and the speed was not checked with reasonable promptness, the thrashing around above the car of a heavy trolley pole playing the part of a shuttlecock between the cross wires and car roof as battledores would be likely to injure someone in some way; and that the high degree of care owing to its passengers made it incumbent on defendant's servants operating the car, if not indeed to maintain a limit of speed that would prevent such violent blows of the pole, at least to reduce speed promptly after the trolley left the wire and so minimize the danger. If so, it follows necessarily that failure so to operate the car was negligent; and if injury resulted, the defendant, in the absence of plaintiff's contributory negligence, would be liable. Some suggestion is made that he was guilty of such negligence by standing on the running board; but this is denied in fact; and if it were true it would not be negligence *per se,* or an assumption of any risk not incidental to that position in the ordinary and proper operation of the car. *Trussell* v. *Morris County Traction Co., ante p.* 533; *Nirk* v. *Jersey City, &c., Street Railway Co.,* 46 *Vroom* 642.

Our conclusion, then, is that there were questions for the consideration of the jury as to whether (1) plaintiff was injured in the manner claimed by him, and (2) defendant ought reasonably to have anticipated some such injury to a passenger by reason of a loose trolley pole thrashing around with the car at high speed, and was consequently negligent in failing to take the appropriate measures to prevent it. The nonsuit was therefore erroneous. The judgment will be reversed to the end that a *venire de novo* issue.

*For affirmance*—THE CHIEF JUSTICE, VOORHEES, VROOM, CONGDON, JJ. 4.

*For reversal*—THE CHANCELLOR, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, BOGERT, VREDEN-BURGH, JJ. 9.